Thank you. Good morning, your honors. I'd like two minutes to reserve two minutes. All right, go ahead and start. Good morning, your honors. Lisa Counters on behalf of the Shiffman Law Office for plaintiff Angela Jones. The case is before you because the agency and the commissioner denied Ms. Jones' application for SSI benefits. In turn, the district court affirmed that denial. It's Ms. Jones is impaired or is unable to sustain competitive employment because of the impairments that were identified by the ALJ as severe, which were degenerative disc disease, diabetes mellitus, Lyme type disease, and the methylene tetrahydrofolate reductase gene mutation. We ask that the court reverse and remand this matter to the agency because we think there are three critical errors made by the district court and the commissioner. When you say remand for award of benefits or remand for reconsideration, what kind of remand do you want? Well, ideally, we'd like a remand for an award of benefits. I think with some of the issues that arose in the appeals council and some of the other issues, it might not 100% meet that criteria, so we would certainly accept a remand for further proceedings. The ALJ erred in giving minimal weight to the treating physicians, Dr. Linkerman and Dr. Miller, while she gave great weight to the non-examining, non-treating agency physician, Dr. Mitgang. We think the second error by the ALJ was disregarding Ms. Jones' symptom testimony. There was no finding of malingering here, and so without a finding of malingering, the ALJ generally is required to accept testimony that's consistent with the conditions that were offered, and she equated Ms. Jones' ability to perform certain activities of daily living and the ability to care for her child with the ability to work, which I think is inconsistent with Garrison and inconsistent with the record. The third error we think requires remand is the dismissal by the ALJ of Ms. Dana Weissman's testimony. Ms. Weissman is Ms. Jones' mother, and she resides with Ms. Jones and her daughter, and the ALJ noted that the mother didn't have medical expertise, and that she gave too much weight to the mother's potential bias, given the financial interest. We think the ALJ erred by disregarding that testimony. With respect to the ALJ's rejection of the treating physicians' testimony and statements, this is a pre-2017 case, so of course, the previous rules apply. If you have an uncontradicted opinion of an examining doctor, the ALJ can't reject it without clear and convincing evidence. If there's a contradicted opinion, the ALJ still has to give specific and legitimate reasons that are supported by substantial evidence. As I read the decision by the ALJ, the ALJ rejects the opinion of the two treating physicians based upon the claimant's description. In your view, did the ALJ accurately recount the evidence provided by the claimant as to the nature of her activities? No, Your Honor, in our opinion, she did not. The claimant testimony that the ALJ relied on was the fact that she could do self-care, perform ADLs, do some household chores, that she cared for her then, at the time, nine-year-old daughter. She used the computer, watched TV, and those were the things that the—and there's only one reference to her exercising, and that appears in the CE, the psychological CE. Other than that, that testimony is that she told the CE, allegedly, that she stretched and especially cautious in concluding that some of the routine things people do every day equate to work, especially when the witness, both the lay witness and Ms. Jones testified that she has periods of time where, when she gets bouts of fatigue and her joint pain increases, where she's not able to do the activities she talked about. She indicated that, you know, I don't think that caring for a nine-year-old child is the equivalent of working, particularly when you live with the child's grandparents. And both the mother and Ms. Jones testified that, when Ms. Jones was incapable or unable to do certain things, the parents—her parents were there to assist and provide after-school care and care for the child during days when mom was not well or not able to care for her. And I think that, you know, this quote from Garrison talks specifically about these types of activities, the ability to talk on the phone, prepare meals, occasionally clean a room, and, you know, care for a child. The—one thing is the ALJ references that she used the computer and watched TV, but there's no evidence and there was no testimony from Ms. Jones as to the extent of that. If she uses the ability—simply the ability to use a computer during the day for a limited period of time isn't the same thing as being able to show up to work. And importantly, with Ms. Jones' conditions, you've got the inability of her to predict when she's going to have a flare-up of the—of her tick-borne disease and the autoimmune gene issue, and you also have an inability of her to predict when her chronic pain gets at issue. So I don't think the ALJ did a very fair analysis of the testimony in that case or considered mom's testimony that indicated she's doing these things, but she's not always doing these things. So, Counsel, maybe I can ask you—so if you—starting on page ER-20, you know, the ALJ said, turning to the medical—this is right in the middle of ER-20—turning to the medical evidence, the objective findings in this case fail to provide strong support for the claimant's allegations. And then it goes through and has—the ALJ has close to three pages of talking about various—about the medical evidence. And then the ALJ goes on and uses that, relies on that to give more weight to a doctor—to give less weight to two of the doctors and more weight to the state agency review physicians and some of the other doctors. And so, as I read it, you know, the ALJ there, at least, in that portion, is doing what we see all the time in these Social Security cases, which is saying, you know, you've got these one thing and you've got—and other physicians are saying something else and I'm going to look at the objective medical evidence and I'm going to weigh. And that's, as I'm sure you're quite familiar with, that's the part that we give significant deference to. Why does that not also affect—because when you go back, it's a couple pages earlier in the decision, but when you go back and you—ALJ basically goes through and lists all of her things she says she can do. And it's true that the ALJ doesn't list all of her caveats there. But as I read it, the reason ALJ doesn't list all her caveats is because ALJ is discounting those caveats. It's not like the ALJ is not—isn't taking them into account. It's definitely given reasons for discounting them later on. But why is that not an appropriate—the ALJ can discount subjective testimony by weighing it against the objective testimony. Would you agree with that? I do agree with that, Your Honor. But there wasn't the objective medical evidence that the ALJ referred to. I think if you reflect on it, it's a little bit of cherry-picking on behalf of the ALJ. A couple things. I'm sorry, I didn't hear. Sorry, cherry-picking? Picking only the favorable— It's always a sense which that's true, right? I mean, you can always—because an ALJ—you can always characterize as cherry-picking when an ALJ picks one—you know, when you've got competing evidence, which I think you have here, and decides to grant one or the other. I mean, you can always say that in a pejorative way as cherry-picking. It's understandable why it can be characterized that way. But I don't know—I think we still have to defer to that weighing, right? So then the question just becomes, did the ALJ need to say specifically, I am discounting her—some of her caveats that she gave when she said she could do these things? Because the ALJ properly says—isn't, I don't think, mischaracterizing when it says that she can do these things. It's just, as you point out, the ALJ doesn't give all of her caveats for that. But the ALJ elsewhere, in the opinion, points to objective medical evidence that thinks is inconsistent with those caveats. So is that—why isn't that good enough for us under—does the ALJ have to show its work at that level of granularity that you're saying? I don't think the ALJ has to show work at that particular level of granularity. But in this what she references in normal findings, a lot of the things she references in normal findings, you wouldn't expect to be abnormal in this particular claimant's position. And she doesn't address the abnormal findings that are made in the Arizona pain records that show, you know, for example, that she had—there was obvious muscle knots or muscle problems when she was examined at Arizona pain. She underwent multiple procedures and takes significant narcotics to control pain that doesn't really much improve above a level five. And so that is also objective evidence in the record that the ALJ can't just discount simply because there's—and there are objective medical findings in the cervical spine and the thoracic spine. There's no nerve root impingement, so she may not meet the listing, but no evidence that what she's testifying to is inconsistent with the objective medical findings. Well, for instance, the ALJ says she stated her pain medication regimen helps keep her pain symptoms more tolerable. So you would call that cherry-picking, but the ALJ says, you know, here's some spots in the record where—I mean, this is kind of—I feel like we see all the time. So I realize I'm kind of taking you over, but this is kind of important. I want to make sure—so it sounds like you're not—you are acknowledging that the ALJ could have been discounting her subjective test, but by looking at these objective things, you're just saying that you think it was an inappropriate weighing because the data just was not there for the ALJ to have put anything on the—to put what it put on the objective side of the scale, so to speak. I think I disagree with your characterization, Your Honor, because I think you have to weigh under the standard in terms of rejecting Ms. Jones' testimony. If it's a condition that can cause the problems—and a couple important points I want to make because I know I'm over, but if it's a condition that can cause the problem, if the claimant testifies that it does cause that problem, and again, even if the medication is helping, she's still taking narcotic medication regularly, multiple medications. Her pain level is not—it helps her to function, but there's a difference between functioning—again, we go back to Garrison, where there's a difference between functioning in ADLs and being able to do certain activities. So I think the ALJ does have to take that into account. Let me make sure I understand, because we are a little over, but you were saying if the ALJ identifies that she has a condition that could cause the problem—could cause, I think, by the problem you mean like a certain level of pain, right? And she testifies that she's—you know, let's say it's a range, a level of pain, and she testifies she's got this level of pain, you know, high-level pain. Then what does the ALJ need to do to properly discount that testimony, in your view? I think the ALJ needs to show that there's malingering or overstating of pain levels. Okay, that's important. So your position seems to be that—which malingering is basically a credibility issue. So the ALJ has to sort of find something that undermines her credibility in order to discount that level of pain testimony. It seems to be your position, is that—like that's the only improper way, or what's the other way? No, I don't think that's the only improper way. I guess I'm going to ask, can the ALJ weigh the objective medical evidence? I'm not saying you're—I'm not asking you to acknowledge the ALJ did that correctly here, but is it permissible for an ALJ if you have a range of—if you have evidence of certain medical conditions that could cause a range of pain, right? And she testifies, my range is up here. It's a high range. What is—do you think it's permissible for the ALJ to discount that based on objective medical evidence that—I'm not asking you to acknowledge that it is actually inconsistent, but if there was inconsistent objective medical evidence, could the ALJ discount that subjective testimony with that objective—is that allowed or not allowed? I don't think it's a yes or no answer, Your Honor. Unfortunately, in these kinds of cases, because you deal with so much variety of medical issues, but when you're talking specifically here about pain complaints, and remember there are other issues on top of her pain that cause her to be disabled, but if she's engaging—sorry. No, that's—I think—so I—it sounds like your but not in this case or something. Well, and I think unless you show evidence of malingering and her testimony about what she did and her limitations— Putting malingering aside. I don't want to—I don't want to—I don't know how you can do that. I do, actually. I do have a question. So, counsel, I'm—when I look at the exhibits from Dr. Limkeman and then from Dr. Miller, what I'm seeing is a to whom it may concern letter from 2016 and then this two-page survey from Dr. Miller. Is that the primary evidence from her treating physicians? They're so—it's so conclusory, and the check the box is really not—is really not helpful. And then—and then the follow-up, the 2019 follow-up after the ALJ issues, her initial decision, aren't—don't really supply any more detail. They're no more helpful other than to say we disagree and still think she's disabled. Well, other than their—their treating records and the fact that they had access to the treating records for Arizona pain and considered those, those are the—that's the opinion testimony about her limitations. And I—I think the important thing about her limitations in this case is that you get an unreliable employee who is unemployable because she's going to miss more than four days of work a month. And even if you take the objective medical—objective medical evidence into account, if you—the physicians having looked at and examined her and looked at the Arizona pain records were the primary treatment. Was—was Dr. Limkeman prescribing all of the heavy medication she was on? No. It's a pretty extraordinary list. It is. Arizona pain was prescribing that, Your Honor. And do we have—do we have a statement from a doctor there? At Arizona pain, we don't have a statement regarding restrictions or limitations now. So we've got—we've got one—one clinic that's issuing all the prescriptions on the—on the heavy medications, including oxycodone and I think morphine and—and everything else. And—and yet a different doctor who's not prescribing those things offering the conclusions on that she's disabled. With respect to limitations, yes. It—is there—is there any possibility that she simply is disabled because she's taking all of these medications? I don't think there's any suggestion in the record that she's taking an inappropriate amount of medications or that they've overprescribed. So— No, but we don't have anything—but we don't have anything from the pain folks. All we have—all we have is stuff from the doctor who's not making those prescriptions. Well, but you do have—you don't have an RFC from the pain folks, frankly, Your Honor, because Arizona Pain Institute doesn't do them. They will not do them. So that's why you don't have a form from them. But what you do have are their records that talk about her limitations, that talk about the objective findings. And—and, you know, the one thing that neither the AL—I want to, I guess, end on this if I've and the gene mutation are severe medical problems. And those problems can cause the—can cause fatigue and the—her inability to do things. And there's no analysis of that evidence by the ALJ or no consideration of those two severe findings and their impact. She focuses primarily on the degenerative disc disease and doesn't really discuss those limitations. I'm way over my time. You're way over. One last question. So Dr. Lincoln is her treating physician? That's her primary— that's her primary care doctor? One of them. Dr. Miller is also her primary care doctor. They cover different times. Okay. All right. Okay. Thank you. Thank you, Your Honors. I apologize. Further questions? Any other questions? Okay. Well, we'll go ahead and make sure you have a little time for rebuttal. And we'll move on to the commission's attorney. Good morning, Your Honors. Daniel Talbert for the Acting Commissioner of Social Security, Kilolo Kijikazi. The administrative law judge in this case reasonably found Ms. Jones's allegations of disabling symptoms and those opinions that supported those allegations to be inconsistent with the record, including both the objective medical record, the various treatment notes and records that the ALJ summarized in several pages of her decision, and the claimant's own level of activity, which included not only being the primary caregiver to a minor child, but also, as is reported in some of those statements, about two hours or more of household cleaning and various chores per day and various other unrestricted— Counsel, you have heard my questions to Ms. Counters about the thinness of the records from the treating physicians. What really bothers me about the government's case here is that the ALJ went over and over and over again about what was inconsistent by relying on a single exhibit. I think it was 4E in the opinion from the ALJ. And it's repeated again and again and again. And it just feels like this was a lot of weight to throw on some fairly casual comments by Ms. Jones that she tried to get her daughter to school and that she tried to exercise and she tried to do what she could, but that at times she had—she said that she was debilitated for months by virtue of the symptoms from Lyme disease. So I'm deeply concerned that the ALJ has thrown an awful lot of weight off of a series of very casual comments in the same way that I'm concerned that Ms. Jones has relied on some fairly casual documentation from her primary treating physicians. So, Your Honor, the response I'd make there is, first of all, I would say that the claimant's reporting of her activities and then her mother's reporting of her activities as well, which is both at the hearing and then in some of these questionnaires and in statements that she's making to Dr. Drake and other doctors, it's fairly consistent that she's indicating that she does have childcare responsibilities. She's engaging in these various activities of daily living. It's not just kind of in one place. It's rather throughout the record. And in fact, this is a claimant who has, as the ALJ found at step four, doesn't really have what's considered past relevant work because she has dedicated her life to raising her children. I mean, essentially been her job both before and after her application for SSI and her alleged onset of disability. So that's really essentially been her life. So that's an important factor in this case. But I also want to note to the extent that she's alleging that she isn't able to keep up with these activities at times because she has these periods of being bedridden from fever or fatigue from this infection that she has. The record really doesn't substantiate or support those claims either. And I would note the ALJ makes a couple of... And how does it not substantiate those claims? Sure, your honor. It doesn't substantiate it insofar as the claimant is not complaining or reporting those symptoms to her treating sources throughout this record. She's not reporting significant fatigue. She's not reporting significant instances. She's not telling her I had this flare up or this bout of my infection that rendered me bedridden for months at a time. It's never reported to the doctors. And actually, the treatment record for that particular infection, most of those notes come from 2015, which is before she applied for SSI and before her alleged onset date. And then we see that in early 2016, she's still taking the... I think it's doxycycline. That's a medication that's to treat the infection. But by mid-2016, when she sees Dr. Drake, the consultative examiner, she says that she's taken this medication, but she's also able to suppress or control the infection with proper diets. And we don't see any other, as far as I could tell through this record, we don't see any other real treatment or reference to that condition and symptoms from it for more than two years. Yeah. You know, if I can come back to the point that Judge Bybu was addressing, I'd just like to read to you from what the ALJ writes and then read to you from what the claimant writes, because it strikes me that what the ALJ writes is really so selective as to be a fundamental distortion as to what she says. And it appears that the ALJ doesn't disbelieve her. It's just that the ALJ doesn't accurately recount what she says or what she writes. So I'll just read from the ALJ. I'm on AR-19. Claimant admitted, this is the ALJ, admitted activities of daily living, including she cleans up after her daughter goes to school. In the functional report, the claimant acknowledged she lives with family, makes her daughter lunch, takes her to school, takes care of her daughter, helps her with homework, takes care of her pet, prepares meals, cleans tabletops, dusts, cleans bathrooms, sinks, rinses dishes, does laundry, drives, goes out alone, shops, plants flowers, spend time with her boyfriend, has no problem getting along with family, friends, neighbors, and others, and can follow instructions well. Well, I'm just reading from AR-256. She describes her routine. I wake up, take my meds, wait for about 20 to 30 minutes before I can really start moving around, make my daughter lunch, take her to school, come home, ice back and neck, treat my feet with lotions and creams for the burning, see my chiro, that is chiropractor, three times, three to four times a week for neck and back pain, sometimes pick up things if feeling well, then pick up my daughter up from school, eat, and go to bed. Later, talking about planting, she plants flowers in pots. Well, she's not digging in the garden. She used to do all kinds of things, but she says, now the only thing I can do is plant flowers, and she plants them in pots. The ALJ also says that Dr. Drake, she, quote, I'm now reading from the ALJ, she told Dr. Drake she does an exercise routine every day. Well, that's not what she told, that's not what Dr. Drake reports. Dr. Drake, who in fact was not doing a physical examination, he was doing a psych examination, Dr. Drake says she tries. So, what am I supposed to do with that, given how much weight the ALJ seems to place upon her daily activities? He's just not, the ALJ has simply not recounted them accurately. So, Your Honor, I think the, what we do with that is we consider, you know, how, so that, if the ALJ hasn't recounted the activities accurately or doesn't have a basis for what she's saying, then there is a serious concern. I understand that. In this case, I would submit that that function report, the claimant does report doing those activities. I mean, the ALJ is not sort of making this up or taking things, you know, exaggerating things. I mean, I don't think the ALJ is saying the claimant is doing strenuous digging or anything like that, for example. The ALJ is considering those activities that she reported, and I would submit that it is reasonable, you know, a reasonable fact finder could look at that and could say, well, yes, she does all of those activities, but that doesn't necessarily undermine her allegations of disability. What I'm worried about here is, I'll just talk a little bit more about sort of the cleaning and so on. She says, I can clean tabletops, dusting bathrooms, but then she says, have to sit and take breaks for neck and back every few days, countertops every day, can flat towers and box. I mean, why shouldn't we remanded the ALJ to say, here's what she actually says. Now, have a look at the total record with an accurate description of what she recounts as daily activities, because the ALJ puts a lot of weight on these daily activities. So, I agree the ALJ does put a lot of weight on those activities. And misdescribes them, or rather fails to include what seems to me very important qualifiers as to how often and under what circumstances she can do these things. Yeah, Your Honor, I would push back. I disagree that the ALJ is mischaracterizing the evidence in the claimant's allegations. So, why do you say that mischaracterizing, that the ALJ is not mischaracterizing when the ALJ has left out every one of the qualifiers? So, the issue that here is that, you know, I guess when you're saying the qualifiers, the fact that she's saying she needs to take breaks afterwards. Well, just for example, the ALJ, she takes her daughter to school. Well, the portion I just read from her statement, she says, well, I wake up, take my meds, I can't do anything. After I bring her home from school, I have to go to bed. I mean, that strikes me as a relevant qualifier. Well, that's that. I mean, I don't think she's. So, I think that she's also saying, though, I would point out that she is helping her daughter with homework. You know, she's saying she's, you know, making food for her. She's helping her with bathing and things like that. Her mother stated in the function report, which, you know, also has indications of the claimant's symptoms and limitations, too. But her mother said in her function report that the claimant is doing about two hours per day worth of various kinds of chores. You know, she's doing those activities. So, if we add that to the child care responsibilities, you know, getting her daughter up, getting her daughter's lunch, preparing her, taking her to school, coming back home, you know, doing that stuff while her daughter's at school, a couple of hours, going back to get her daughter, bringing her back home, making dinner, helping her with homework. It's a fairly extensive, there's some fairly extensive evidence there that we would submit could support the conclusions the ALJ is making. Now, again, I could see. Well, what the ALJ does with the reports, what the ALJ does from the reports of the mother and daughter support the testimony of the claimant, but the ALJ says, I'm going to disregard it because there's an incentive to not tell the truth. So, the ALJ is not using them to support. The ALJ is discounting them and saying, I'm not going to place any weight on it. Well, so, with regard to the mother's statements, the ALJ is saying here that what the mother's saying about the various limitations that the claimant has, the symptoms and everything like that, the ALJ is giving little weight to her, to the mother's assessment, which, again, is sort of a recounting of symptoms, just like what the claimant said. The claimant says, oh, I have, I'm doing these activities, but I have all these limitations. I have all these problems. Those are sort of the, I think, caveats, as I think Judge Van Dyke described them. The claimant, the ALJ is not really accepting those and is largely rejecting them by being, as being inconsistent with the record. Now, she's doing that for both the claimant and for the mother who also gave the testimony. I would be more inclined to accept that as an accurate statement, had the ALJ accurately described what the claimant says is going on and then says, but that's not inconsistent with the record. But the ALJ isn't just not telling me accurately what she's reported. I think I've made the point and you understand it, so, yeah. Yes, Your Honor, I do. I see him over my time. If I could just, I'll just very quickly wrap up to, in response to that, and I'll answer any other questions, of course, the panel has, but we, I mean, I maintain the position that, yeah. Let me check and see if my colleagues have any other questions, any other questions for, all right. Well, I think we've taken you over and I think we probably have all the answers we can get, but we'll put another minute on the clock for the plaintiff appellant here, and we'll let you go ahead and have your rebuttal time. I think you're on. I think you may be muted over on your end. Thank you, Your Honor. I really don't know that I could say it any better than the last discussion between counsel and Ben. Well, can I ask you a question about that? Sure. Because, I mean, there is the whole section where the ALJ, in fact, I think multiple times, the ALJ really does mention that she can do these things, and I think as the government's lawyer said, well, she can do those things, but I think that the issue is she does give a lot of caveats in saying she can do those things, and it is true that the ALJ does not, where it mentions the things she can do, sort of include those caveats, but the ALJ does elsewhere say, for instance, on the bottom of page ER 32, it says, although the claimant is likely to have some pain and limitations, the records discussed above, and that's several pages of sort of objective medical findings that the ALJ goes through and quickly summarizes in between the section we were just talking about, it says the records discussed above do not support the extent the claimant has alleged, based on the objective physical examinations, which show many objective findings. I've cut a few of the words out, but the point is, it does seem like the ALJ is saying, over here, I'm saying she says she can do these things. There's no question she can do those things. Over here, the ALJ is saying, and by the way, I've discounted the extent because it's just not consistent with the objective evidence. So, it's not, the ALJ does kind of give us the reason. Unfortunately, the ALJ didn't kind of do it all together and make it easy, but I'm trying to figure out why that's error. I guess, you know, maybe the ALJ is just wrong in saying, in its view of the objective physical examinations. What's your thought? My thought on that, Your Honor, is I think it goes back to the credibility issue then. Even if you're weighing the objective medical evidence, the reasons and her inability to do these things, you know, on and off, are related to the pain that comes and goes, and are related to the fatigue that comes and goes. And you can't deny, if the ALJ says, well, that's inconsistent with the objective medical evidence, then she's making credibility determination that she's malingering. I think I hear your argument, which is, there's a sense in which, when you read all of these social security cases, it always does feel like there's sort of an implicit credibility thing. If the ALJ is going to weigh the various doctors, the objective stuff from various doctors against the plaintiff's subjective pain testimony, I guess you could say there's an implicit credibility thing. But very often in these cases, it's not like the ALJ says, this person is malingering, or this person is not credible, this person is lying, right? That's not normally how these opinions read. They don't accuse the claimant of lying, they just say there's an inconsistency here. The objective evidence just does not support the level that this person is, in fact, there's nothing in the objective evidence that would support that, et cetera. And so you keep coming back and saying it's a credibility thing, but is it your position that the ALJ has to say, not credible or something like that? I don't think the case law requires that. No, I don't think it does either, Your Honor. But the case law does require the ALJ, if the condition would likely cause the symptoms that the plaintiff or the claimant is complaining of, has to give credit to that testimony, full credit to that testimony, not partial credit that she does those things. And so I think it's, I do think there has to be, I think just saying it's not consistent with the objective medical evidence. Counsel, I think I know what standard you're mentioning. It says what the ALJ cannot do is discount that testimony simply because it's not fully corroborated by, so in other words, it can't essentially render that testimony superfluous by saying, I'm not going to give your testimony as to the pain, wait unless it's fully corroborated by objective medical testimony. But that's different, I think, than where an ALJ says, look, I'm looking at all this objective, and there's a lot of objective medical testimony that's inconsistent with because it just doesn't show. I mean, we have cases that do that all the time. So I don't know that the ALJ was forced to give full credit. Otherwise, it kind of gets back to your point earlier, which is you'd show fraud or lack of credibility. And that's what I'm trying to figure out. It's almost like your position is that that's the only reason the ALJ could have discounted this testimony. I'm sure that's true. No, I don't think that's, that's not what I'm trying to communicate, Your Honor. But what I'm trying, I think it goes back to when you say of all the objective evidence that the ALJ cites, the ALJ doesn't cite the MRI that shows the, that, you know, recognizes that she has these problems. The ALJ doesn't talk about the narcotic pain medication she's on. A physician in this day and age isn't going to give that kind of narcotic pain medication if the person is not serious, has serious difficulty and needs that level of medication to do some level of activity. Okay, so it sounds like you're saying it doesn't, the ALJ and the weighing is weighing wrong. And that's, that's legitimate. Certainly, I'll take a close look at that. I have a question. Counsel, so you've heard me express dissatisfaction with, with sort of the state of the record coming from the, from her treating doctors. And you've heard me tell the government that I was, I was not real happy with the way that the ALJ cited a single, a single piece of evidence about her daily activities and, and seemed to use that or place great emphasis on that. If we were to remand this, what would be different? Do you get a chance to, do you get a chance on remand to, to redevelop the record? Does the government get a chance to redevelop the record and supplement it with, with, with new testimony? Is it a do-over or is it, or is it just the ALJ taking a look at this record again and reaching a decision that answers the questions that we've raised? Well, I think the ALJ, I think it would be looking at this record. I don't think you get a do-over. I mean, looking at, you get to look at this record and all the medical evidence is there. We, and with the, the ALJ rejected the treating physician because there weren't any, there wasn't any limitations. And then what the treating physician, Dr. Miller says is, she can work five hours a day, but she can't work eight hours a day. And she has to be able to work eight hours a day, 40 hours a week, 50 weeks a year to, to have, to be a reliable employee and to be employable. And the VE supports that, that limitation that if you, if you have those limitations and you're going to be missing and you can't work eight hours a day, that's, she's not employable. But, but the, but the bottom line is that the, that the ALJ would be looking once again at this same record. Well, with the addition of the information that was provided at the appeals council level, which addressed why the ALJ rejected the two treating physician opinions. You're that, those, those, that's the two nine, the two 19, the 2019 letters from Dr. Limcoman and Dr. Dr. Miller. Correct. Okay. Thank you. Any other questions? No. All right. Well, thank you both for, again, a very helpful argument. And this case will now be submitted and we'll be moving on to the next case.
judges: FLETCHER, BYBEE, VANDYKE